IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

CLINE V. SIMMONS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

PEGGY CLINE AND NAKED MAIDEN'S FALLS, APPELLEES,

V.

LEE M. SIMMONS, APPELLANT, AND KRISTOPHER QUALLEY, APPELLEE.

Filed April 30, 2024.    No. A-23-165.

Appeal from the District Court for Cherry County: MARK D. KOZISEK, Judge. Affirmed.

Bartholomew L. McLeay and Dwyer Arce, of Kutak Rock, L.L.P., for appellant.

Andrew D. Weeks and J. Michael Hannon, of Baylor, Evnen, Wolfe & Tannehill, L.L.P., and Aisha Carr for appellees Peggy Cline and Naked Maiden's Falls.

MOORE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Lee M. Simmons appeals from an order of the district court for Cherry County, which granted Peggy Cline's request for specific performance as to a right of first refusal she possessed in real property which had recently been purchased by Simmons. Following a jury trial, the district court found that Cline had not been provided with sufficient notice of the sale to Simmons pursuant to the terms of the right of first refusal and that, as a result, the land should be transferred to her upon receipt from her of consideration consistent with the terms and conditions of the sale to Simmons. For the reasons set forth herein, we affirm.

### BACKGROUND

This appeal involves land that was originally owned by Peggy and her now deceased husband, Steven Cline, but was later sold to an acquaintance of the Clines', Kristopher Qualley. A

brief history surrounding the sale of the property to Qualley is beneficial to understanding the current property dispute.

Peggy and Steven lived in Colorado, but owned various trout farms, including one near Valentine, Nebraska. Qualley was an employee of the Valentine trout farm beginning in the 1990's. Qualley lived on the farm, raised the fish, and then transported the fish to Colorado for distribution. In approximately 2005, when the Clines decided to no longer operate the Valentine trout farm, Qualley was "pretty devastated." In order to reward Qualley for his work as an employee and to give him the opportunity to start his own farming operation, Steven offered to sell certain real property to Qualley. The property offered to Qualley was a small portion of the 178-acre "Potter Property," which the Clines had purchased in the 1980's. This was not the same property where the trout farm had been located.

Steven offered to sell to Qualley a 37.31 acre tract of land within the Potter Property. This parcel is referred to in our record as the "Possum Property." Also included within the offer was a 1.07-acre easement through the Potter Property, which was necessary to access the Possum Property. Qualley agreed to purchase the Possum Property and the accompanying easement. As a part of the sale, Qualley and his then wife, Christine, executed a promissory note promising to pay Steven $37,310 over an 8-year period, in addition to $10,073.72 in interest for the purchase of the property. The Qualleys also executed a trust deed which named the Clines' L.L.C., Naked Maiden's Falls, as the beneficiary. One of the terms of the trust deed provides, "Should Trustor [the Qualleys] desire to sell or encumber the subject premises or any part thereof, they shall forthwith obtain the consent of Beneficiary [Naked Maiden's Falls] to such sale or encumbrance while any sums remain due on the Note secured by this Trust Deed."

Subsequent to the sale, in April 2005, the Clines filed a warranty deed memorializing the sale of the Possum Property and the Potter Easement to the Qualleys. Included within the warranty deed was a right of first refusal retained by the Clines. That provision provided:

> And Subject to grant of right of first refusal to repurchase the Property, such that Grantors [the Clines] shall have the right to repurchase the Property within 60 days after receipt of written notice of a bona fide offer from a third party, on the same terms and conditions and for the same price offered by the third party by giving notice of exercise of the right of first refusal to the Grantees. If the right of first refusal is not exercised, the Grantees shall have the right to sell the Property to the bona fide third party for the same terms, conditions and price for a period of six months after the right of first refusal expires. If such sale does not occur, the right of first refusal shall continue as to any further bona fide third party offers to purchase the Property. This right of first refusal shall be personal to [the Clines] and shall expire upon the death of the last of them to die.

Subsequent to the sale of the Possum Property to the Qualleys, Peggy, on behalf of Naked Maiden's Falls, paid $2,551 in property taxes on the land that Qualley had failed to timely pay. Pursuant to the terms of the trust deed, this amount increased the amount that the Qualleys owed for the land:

> If Trustor [the Qualleys] fails to pay taxes or assessments, maintain the Property as provided herein, Beneficiary [Naked Maiden's Falls] may pay any such amounts or take steps to protect the value of the Property and the rights of Beneficiary in the Property. Any

sums Beneficiary may advance for payment of any such taxes or assessments, maintenance and protection of the Property shall be secured by this Trust Deed, shall constitute a debt due from Trustor to Beneficiary, and shall bear interest from the date of disbursement until paid at the rate of 12% per annum.

In addition, in approximately 2018, Peggy obtained a default judgment against Qualley in a Colorado court regarding his failure to pay for a truck and trailer that Steven had sold to him. The judgment was for $30,500 plus interest. This judgment was registered in Cherry County, Nebraska, and acted as a judgment lien on the Possum Property.

In early March 2019, Peggy learned that Qualley had sold the Possum Property and the Potter Easement to Simmons. She had not received notice of the sale prior to it being executed, nor had she been given an opportunity to exercise her right of first refusal. Notably, in addition to selling the Possum Property and the Potter Easement to Simmons, Qualley also sold him a third parcel, referred to as the Foster Property. Peggy had no connection to or interest in the Foster Property.

On March 15, 2019, Peggy filed a complaint in the name of Naked Maiden's Falls, naming Qualley and Simmons as defendants. In the complaint, she erroneously indicated that the L.L.C. possessed a right of first refusal to the Possum Property and the Potter Easement. She alleged that Qualley had sold the land to Simmons without allowing the L.L.C. to exercise that right of first refusal. Peggy asked the district court for "a determination of rights" under the right of first refusal and to void the sale of the property to Simmons. In June 2019, the parties agreed to substitute Peggy as the named plaintiff, because she possessed the right of first refusal personally and Naked Maiden's Falls did not possess such interest. Naked Maiden's Falls was later added back into the complaint as an additional plaintiff.

While the litigation was pending, Peggy amended her complaint multiple times. The operative complaint, titled the "Fourth Amended Complaint," was filed in July 2022. In that complaint, Peggy alleged that she was entitled to specific performance of the warranty deed, and thus, the right of first refusal. As a part of this allegation, she affirmatively indicated that had she been offered the option to repurchase the Possum Property and Potter Easement on the same terms and conditions and for the same price offered by Simmons, she was ready, willing, and able to purchase the land. Peggy asked for a determination that the sale of the land to Simmons was void and that she be provided an opportunity to exercise her right of first refusal.

Qualley did not respond to any of Peggy's complaints. In Simmons' answer to the fourth amended complaint, he raised various affirmative defenses, including that Peggy waived any interest in her right of first refusal by failing to timely exercise the right and that the right of first refusal was ambiguous and unenforceable. The answer also included a counterclaim requesting that the district court quiet title to the Possum Property and Potter Easement in his name. In the alternative, he asked that he be reimbursed by Peggy for any amounts he had paid toward the land.

During the discovery process, Peggy learned more about the terms, conditions, and price involved in the sale of the Possum Property and the Potter Easement. In May 2020, Peggy sent Simmons a set of interrogatories. Interrogatory No. 8 asked Simmons to identify, "The terms of the sale of the Property from Kristopher Qualley and Michelle Qualley and all individuals involved in said sale." Elsewhere in the interrogatories, "the Property" was defined as "the real property

that is the subject of [Peggy]'s Amended Complaint and Second Amended Complaint, comprised of 37.31 acres and 1.07 acres," namely, the Possum Property and the Potter Easement. Simmons answered Interrogatory No. 8 on June 8, by stating, "Simmons and Kristopher Qualley agreed that Simmons would satisfy preexisting liens on the Property in return for ownership of the Property." The liens associated with the Possum Property and the Potter Easement included the remaining amount due on the promissory note, the past due taxes that had been paid by Peggy, and the Colorado judgment lien. Simmons had not paid these amounts to Peggy.

Peggy also received information regarding Simmons' purchase of the Foster Property, which was purchased at the same time as the purchase of the Possum Property, and which was purchased with similar terms and conditions, namely, that Simmons would pay off the liens associated with the Foster Property and, in exchange, would receive the title to the property. Simmons paid off two liens associated with the Foster Property, a construction lien totaling $10,500 and the remaining note on the property, totaling, $40,635.50.

Given the information learned by Peggy through the discovery process, in particular Simmons' answer to Interrogatory No. 8, she instructed her lawyers to author a letter to Simmons' lawyers on July 8, 2020, exercising her right of first refusal. Such letter was delivered within 60 days of her receiving Simmons' answer to the interrogatory. The letter reads, in part:

> It is understood that Mr. Simmons and Kris and Michelle Qualley purported to enter into an agreement whereby Mr. Simmons was to satisfy all liens on the Possum Property, the Easement Property, and the Foster Property in return for ownership of those respective properties.
>
> Ms. Cline hereby provides notice under her Right of First Refusal to the Qualley Defendants and Defendant Simmons that she is ready, willing, and able to pay Defendant Simmons $2.00 for the Possum Property and Easement Property and hereby exercises her right to do so.
>
> In the event it was proper to join the Possum Property, Easement Property, and the Foster Property for purposes of Ms. Cline's Right of First Refusal, which Ms. Cline denies, Ms. Cline hereby provides notice of her intent, under those circumstances, to exercise her Right of First Refusal to the Qualley Defendants and Defendant Simmons and that she is ready, willing, and able to pay Defendant Simmons $51,135.50 less the amount owed to Ms. Cline and Naked Maiden Falls, LLC on the Foreign Judgment lien, the Deed of Trust, and the property tax lien with interest through the date of transfer for the Possum Property, Easement Property, and the Foster Property and hereby exercises her right to do so.

Peggy's letter was never acted on by Simmons because he believed her offer did not match his offer to the Qualleys.

A jury trial was held on Peggy's complaint for specific performance and on Simmons' counterclaim to quiet title to the land in his name over the course of three days in October 2022. We recount the evidence presented at the trial which is relevant to the resolution of this appeal.

Peggy testified that when she and Steven sold the Possum Property and Potter Easement to Qualley that they retained a right of first refusal so that if Qualley ever wanted to sell the properties, they would have the ability to buy the land back, rather than have it sold to a third party. Her expectation with regard to the right of first refusal was that she would receive notice of any

potential buyer, the price, and any other terms and conditions of the offer to purchase prior to any sale taking place. Peggy testified that this did not happen when Qualley sold the land to Simmons. Instead, she learned of the sale of the Possum Property and the Potter Easement by way of her attorney in Valentine after it had taken place. She received no advance notice of the pending sale, nor did she receive any information about the specifics of the offer so that she could timely exercise her right of first refusal. Additionally, she had not consented to the sale of the land as the representative of Naked Maiden's Falls, which was the beneficiary of the trust deed and pursuant to that deed was entitled to consent to a sale.

At the time of the February 2019 sale to Simmons, Qualley still owed approximately $4,500 to Peggy for his purchase of the Possum Property and the Potter Easement and for her payment of back taxes. In addition, Qualley had not paid any money toward the Colorado judgment, which by February 2019, had accrued to approximately $33,000. Despite Simmons' representation that he was to pay off the existing liens on the Possum Property and the Potter Easement as part of the sale, Peggy testified that she never received any payment from Simmons on the liens after the purported sale of the land.

During her testimony, Peggy explained that she filed a lawsuit after learning of the breach of the right of first refusal. She did not reach out to Qualley directly prior to filing suit because she had been unsuccessful in her efforts to communicate with Qualley since approximately 2012. She testified that after she filed the lawsuit, neither Qualley nor Simmons ever reached out to her to disclose the terms of the sale of the Possum Property and the Potter Easement. She admitted that she ultimately was provided information about the price, terms, and conditions of the sale during the discovery process. And, while she attempted to timely exercise her right of first refusal after learning of the price, terms, and conditions, she was left in the uncomfortable position of trying to match an offer and sale for which the buyer had never made payment. Essentially, she believed that Simmons had obtained the deed to the Possum Property and the Potter Easement without paying any money toward the liens, contrary to his arrangement with Qualley.

Peggy affirmatively asserted during her testimony that she continues to be ready, willing, and able to match the price, terms, and conditions of Simmons' offer for the Possum Property and the Potter Easement. She indicated that this would be true even if she also had to match the offer on the Foster Property and even if she had to release her liens on the Possum Property and the Potter Easement.

Although Qualley did not participate in the lower court proceedings or attend the trial, his deposition testimony was offered into evidence. During his deposition, Qualley testified that he purchased the Possum Property and the Potter Easement from the Clines in June 2005. He believed that the promissory note for the purchase of the land had been fully paid to Peggy some time ago by his brother and sister-in-law. He also believed that he had always paid the taxes on the land since owning the property and did not think he owed any money to Peggy for her payment of back taxes. Qualley claimed to have no knowledge of the Colorado judgment entered against him and in favor of Peggy.

Qualley indicated that Peggy never reached out to him regarding his sale of the Possum Property and the Potter Easement to Simmons. He indicated that Peggy had the knowledge and the means to contact him. Qualley testified to his understanding of the price, terms, and conditions of his sale to Simmons. Simmons "was going to take care of all the liens that were on [Qualley's]

foreclosure notice," including paying the liens and obtaining a cancellation of the notices of default. In exchange, Qualley deeded to Simmons the Possum Property, the Potter Easement, and the Foster Property.

Simmons testified in person at the trial; however, excerpts of his prior deposition were also read into evidence. He testified that he owns and operates the "Niobrara River Ranch" near Valentine, Nebraska. The ranch is a tourist attraction. The Possum Property is near his other properties and he believed it would be a good location for additional guest cabins for the ranch. In addition, it provided good protection for cattle. As a result of his interest in the Possum Property, he agreed to enter into an arrangement with Qualley, who he had known for some time. Simmons understood that Qualley was in financial trouble and needed assistance. As such, Simmons offered to "take care of all of [Qualley's] debts and [Qualley] would transfer [the Possum Property, the Potter Easement, and the Foster Property] to [Simmons]." Simmons noted that implicit in this arrangement was that he needed to obtain cancellations of debt and releases for all of the liens.

During his testimony, Simmons acknowledged that he had discovered Peggy's right of first refusal on the Possum Property and the Potter Easement around the time of his purchase of the land. He admitted that after discovering the right of first refusal, he did not obtain any assurances from Qualley that Peggy had been notified of his offer, nor did he reach out to Peggy himself with written notice of the price, terms, and conditions of his offer. However, he also noted that Peggy had never reached out to him after finding out about the sale. Simmons testified that the first time he provided any information to Peggy about the price, terms, and conditions of his offer was in his answers to interrogatories in June 2020. He did acknowledge that in his answer to her interrogatory, he did not specifically indicate that obtaining releases of the liens and cancellations of debt was a specific term and condition of the sale.

Simmons paid $51,135.50 toward obtaining a release from a construction lien on the Foster Property and obtaining a cancellation of default on Qualley's note which existed on the Foster Property. Simmons admitted that he has not paid any money to Peggy or anyone else to satisfy the liens on the Possum Property and the Potter Easement. He blamed Peggy's failure to provide him with the exact amount due and owing to her for his failure to make any payments.

Eric Scott, one of Simmons' attorneys who oversaw the purchase of the Potter Easement, also testified at trial. Relevant to this appeal, Scott testified that in early March 2014, he contacted Peggy's attorney in Nebraska in an attempt to learn the pay-off amounts for the liens she held on the Possum Property and Potter Easement. In his conversation with the attorney, she never brought up the right of first refusal. However, by that time, Scott was already aware of the right held by Peggy. Scott followed up with the attorney by letter on March 19, 2019, after Peggy had filed her lawsuit. In the letter, Scott indicated that the Possum Property and the Potter Easement was now owned by Simmons and that Simmons would like to know the payoff amounts for any liens on the properties held by Peggy.

At the close of the evidence, the district court submitted two "Verdict Interrogatories" to the jury to clear up certain ambiguities with the language of the right of first refusal. Based upon these interrogatories, the jury determined that the right of first refusal provided that the written notice that must be provided to Peggy before the 60-day period in which to exercise the right is triggered is notice that "a bona fide offer for the property has been made by a third party with the terms and conditions and price of the offer." The jury then determined that such written notice of

the price, terms, and conditions of the offer should be provided by "only Qualley," rather than by either Qualley or Simmons or by any other person. The jury ultimately entered a verdict in favor of Peggy on her claim that she had not been provided with an opportunity to exercise her right of first refusal for the Possum Property and the Potter Easement.

The district court accepted the jury's verdict and its findings regarding the interrogatories. The district court then entered a final judgment, explaining the rights and obligations of the parties. Given the jury's finding that Peggy "was entitled to written notice to be provided by Qualley of the terms, conditions, and price of any bona fide offer he received before [Peggy's] 60 day period in which to exercise her right of first refusal was triggered," and given that Peggy never received such notice, the district court found that Peggy was entitled to specific performance in the form of being given the opportunity to exercise the right of first refusal. The court determined that Peggy could not be required to also purchase the Foster Property in exercising her right of first refusal as "bundling" of the properties was not appropriate here. The district court denied Simmons' counterclaim to quiet title of the Possum Property and Potter Easement in him.

Ultimately, the district court instructed the parties as follows. Within 30 days from the entry of the judgment, Simmons was ordered to convey to Peggy warranty deeds for the Possum Property and the Potter Easement and to deposit the executed deed with the clerk of the district court. Qualley was ordered to convey to Peggy quitclaim deeds for the Possum Property and the Potter Easement and to deposit the deeds with the clerk of the district court. Also within 30 days from the entry of the judgment, Peggy was ordered to file a release and satisfaction for the Colorado judgment and Naked Maiden's Falls was ordered to request and file a deed of reconveyance for the 2005 trust deed associated with the properties. Once Peggy and Naked Maiden's Falls had filed with the clerk of the court an affidavit demonstrating their compliance with the above actions, the deeds were to be delivered to Peggy. However, if Peggy and Naked Maiden's Falls did not comply with the above ordered actions, the clerk of the court was to return the deeds to Simmons.

Simmons appeals from the district court's judgment here.

ASSIGNMENTS OF ERROR

Renumbered and restated, Simmons first assigns and argues that the district court erred in denying his motion for directed verdict by finding that his answers to interrogatories did not constitute notice to Peggy of the terms and conditions of his purchase of the Possum Property and the Potter Easement and that her letter acknowledging such notice constituted a waiver of her argument that she did not receive notice. As a part of this argument, Simmons also asserts that even if the district court properly overruled his motion for a directed verdict, that the court erred in accepting the jury's finding that Peggy never received notice of his offer to purchase the property. Second, Simmons alleges that the district court erred in concluding that the sale of the Possum Property and the Foster Property could not be bundled together for purposes of the right of first refusal. Third, Simmons argues that the district court erred in denying his counterclaim which asked that title to the Possum Property and the Potter Easement be quieted in his name.

STANDARD OF REVIEW

An action for specific performance sounds in equity, and on appeal, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent from the conclusion reached by the trial court. *Langemeier v. Urwiler Oil & Fertilizer*, 265 Neb. 827, 660 N.W.2d 487 (2003); *Hongsermeier v. Devall*, 16 Neb. App. 379, 744 N.W.2d 481 (2008).

In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019).

ANALYSIS

*Whether Peggy Received Proper Notice of Simmons' Offer to Purchase Property.*

In Simmons' first assigned error, he alleges that the district court erred in concluding that Peggy never received proper written notice of the price, terms, and conditions of his offer to purchase the properties from Qualley, and that, as a result, the 60-day period in which Peggy could exercise her right of first refusal had not been triggered. Simmons asserts that he provided written notice of the price, terms, and conditions of his offer to Peggy in June 2020, during the discovery process, and that such notice triggered the 60-day period. Simmons asserts that his motion for directed verdict on this issue should have been sustained. Simmons made motions for directed verdict both at the end of Cline's case-in-chief and at the close of evidence. Because Simmons' motion at the end of Cline's case-in-chief was overruled and Simmons chose to present evidence in support of his answer, he waived any right to insist that the district court erred in overruling the initial motion. However, we can review whether the district court erred in failing to sustain the motion for directed verdict made at the close of all of the evidence. See *Anderson v. Babbe, supra.*

Simmons argues that his June 10, 2020, answer to Cline's interrogatory constituted adequate notice of the terms, conditions, and price that he offered to Qualley in return for the Possum Property and the Potter Easement. He further claims that the July 8, 2020, letter sent by Cline's counsel in response to the answer to interrogatory constitutes an acknowledgement of the terms, conditions, and price. We agree that if the answer to the interrogatory constituted an accurate rendition of the terms, conditions, and price of Simmons' offer to Qualley, any failure to match that offer by Cline could have resulted in the court sustaining Simmons' motion for directed verdict. However, given our standard of review and the nature of the evidence adduced, we cannot find error in the district court's decision.

We first must consider the events preceding the June 10, 2020, answer to interrogatory. In his testimony, Simmons admitted that the day after the deed to the Possum Property was executed and the day before the deed on the easement property was executed, he became aware of Cline's rights regarding the property. Neither he nor Qualley took the initiative to provide written notice of the offer as required by the terms of the right of first refusal. Simmons' attorney, Scott, did contact Cline's attorney requesting a payoff amount for money still owed by Qualley. However,

Scott recited in his letter of March 19, 2019, that the Possum Property and the Potter Easement had been purchased by Simmons. There is no written contract that details the terms, conditions, and price. The deeds reflect consideration of $1 and other valuable consideration for both the Possum Property and Potter Easement. While Simmons did become the title holder of record, he made no other efforts to determine the amount of funds that would be required to pay off Qualley's debt and any other liens that may exist on the property. At the time his answers to interrogatories were drafted (and at the time of trial) the amount purportedly paid by Simmons to Qualley was $2.

It is against this backdrop that Cline reacted in sending her July 8, 2020, letter. Simmons' answer to the interrogatory is brief. It reads "Simmons and Qualley agreed that Simmons would satisfy preexisting liens on the Property in return for ownership of the property." Even though the answer was lacking in detail, the letter drafted by Cline's counsel acknowledges the answer as "written notice of the terms of Mr. Simmons' purported deal to purchase the Possum Property, Easement Property, and the Foster Property." The letter then states: "Thus please consider this letter as notice of Ms. Cline's election to exercise her Right of First Refusal for the purchase of the Possum Property and the Easement Property as outlined below." The next paragraph reads: "It is understood that Mr. Simmons and [Qualley] purported to enter into an agreement whereby Mr. Simmons was to satisfy all liens on the Possum Property, the Easement Property, and the Foster Property in return for ownership of those respective properties."

The foregoing language reflects uncertainty on Cline's part as to what the exact terms of the offer were. She repeatedly referred to the "purported agreement." The use of the term purported conveys the message that Cline believes that the actual agreement existing between Simmons and Qualley may not be fully or even accurately described in the answer to interrogatory. Nonetheless, Cline proceeded to state that she was ready, willing, and able to pay Simmons $2 for the Possum Property and Easement Property. This $2 matched the amount Simmons had paid to Qualley as of that date.

Simmons claims that Cline's offer did not match his offer to Qualley in that Cline says nothing about satisfying the liens. Moreover, he claims that the offer recited in his answer to the interrogatory implies that he was also promising to obtain lien releases as to all indebtedness Qualley had that related to the property. However, Simmons' testimony at trial casts doubt on his position. On cross-examination, Simmons testified that while obtaining releases and cancellations was one of the terms of his agreement with Qualley, he did not include that term in his written answer to Cline's interrogatory. The following colloquy occurred:

Q. And likewise, when I was listening to counsel's questions of you and Kris Qualley today, there was an emphasis placed on the fact that there was additional terms and conditions regarding obtaining releases and cancellations. Correct?

A. Yes.

Q. And yet, you did not put that in writing in response to the answer to interrogatory -- in your answer to interrogatory, did you?

A. They were already released.

Q. That's not my question. My question is, in your answer, your written answer, did you identify that additional term and condition that has now been brought out in court by your attorney?

A. I guess not.

Q. So you've never disclosed that term and condition in writing, have you?

A. I would think checks and lien releases would be disclosing.

Q. Now that's not my question. My question is with response to you identifying the terms and conditions in response to the interrogatory and you have not done that. Have you?

A. Okay, no.

Q. Since you were asking about time, it looks like your counsel served these on June 8th, 2020. Do you see that?

A. Okay, yes.

Q. And here we are, October 26, 2022, and the – we're now learning that you haven't disclosed additional terms and conditions in response to this interrogatory. Correct?

A. Okay. Yes.


Given Simmons' testimony that additional terms and conditions were not disclosed in the interrogatory response, we cannot find error in the district court's decision to overrule Simmons' motion for directed verdict. In considering the motion, Cline was entitled to have every controverted fact resolved in her favor and to have the benefit of every inference that could be reasonably deduced from the evidence. Given Simmons' own acknowledgment as set forth in his testimony above, there remained controverted facts for the jury to determine.

In Simmons' brief to this court, he also appears to argue that even if the district court properly overruled his motion for a directed verdict, that the court erred in accepting the jury's finding that Peggy never received notice of the terms, conditions, and price of his offer to purchase the properties. Upon our review, we can find no error in the court's acceptance of the jury's finding.

During its deliberations, the jury was asked to resolve two ambiguities in the language of the right of first refusal. First, it was asked to determine what information constituted notice of a bona fide offer. The jury indicated that such notice must include the specific terms, conditions, and price of the offer. The jury was next asked to determine who was required to provide the written notice. The jury found that "only Qualley" could provide written notice which would trigger the 60-day period for Peggy to exercise the right of first refusal. Our de novo review of the record clearly indicates that Qualley never provided written notice to Peggy of the pending sale of the Possum Property and the Potter Easement or the terms, conditions, and price of the offer for sale by Simmons. The closest Qualley got to providing notice to Peggy of Simmons' offer was during his trial deposition taken in April 2022. At that time, he testified that Simmons was to pay all the liens on his "foreclosure notice" and obtain cancellations of debt. In exchange, Qualley would transfer the Possum Property, the Potter Easement, and the Foster Property to Simmons. However, Qualley's deposition testimony did not constitute written notice as was required by the language of the right of first refusal. As such, the testimony did not trigger Peggy's 60-day period to exercise the right of first refusal.

Notably, in his brief to this court, Simmons does not challenge the jury's finding that only Qualley could provide such notice. Rather, he simply appears to ignore the jury's finding except for making one reference to the jury's verdict being "advisory." However it was Simmons who

sought a jury trial. In his brief to the district court he contended that a jury must resolve any contract ambiguities.

Upon our de novo review of the record, we are compelled to affirm the findings of the jury and district court that prior to trial, Qualley never provided written notice to Peggy of the price, terms, and conditions of Simmons' offer to purchase. As such, Peggy's 60-day period to exercise her right of first refusal was never triggered. Moreover, even if we were to consider whether the jury should have found that Simmons could also provide notice to Cline, Simmons' testimony establishes that his answer to Cline's interrogatory did not disclose all of the terms and conditions of the sale. Therefore, Simmons' actions also failed to trigger Peggy's obligation to exercise her right of first refusal.

*Bundling of Properties.*

In Simmons' brief on appeal, he next challenges the district court's finding and order that Peggy does not have to purchase the Foster Property as part of her exercising her right of first refusal. Essentially, Simmons asserts that the terms and conditions of his offer to Qualley and Qualley's subsequent acceptance of that offer was contingent on Simmons purchasing the Possum Property, the Potter Easement, and the Foster Property. Simmons believes that if Peggy is to match the terms and conditions of his offer in exercising her right of first refusal, she must also purchase the Foster Property, since that was part and parcel of his offer to Qualley. As a part of his assertion, Simmons argues that Nebraska law permits such "bundling" of properties in the exercise of right of first refusals.

Upon our de novo review of the record, we conclude that the evidence presented by the parties indicated that Simmons' purchase of the Possum Property and Potter Easement and his purchase of the Foster Property constituted two separate transactions with two separate payments, rather than one "bundled" transaction. As such, we need not decide whether Nebraska law would permit Simmons to bundle all three properties together for the purpose of Peggy's exercise of her right of first refusal.

After the close of evidence, the district court commented in open court on whether Simmons had demonstrated that his purchase of the Foster property was tied to his purchase of the Possum Property and Potter Easement such that the purchases were all part of one offer and one transaction. The district court stated:

> We've got the issue of Simmons and Qualley both maintaining that the deals were bundled and combined, but their actions show otherwise. They were not in any way treated the same. There was performance with the Foster Property; [Simmons] paid $10,000 on February 28 of '19; he paid $40,635.50 on March 1 of '19 with regard to . . . the lien, the contractor's lien and the deed of trust lien. So those debts were actually paid off on . . . February 28 of '19 and March 1 of '19.
>
> In contrast to that, inquiry was not even made with regard to the Possum Property until March 4. And our record establishes that there is no question that there was an inquiry made with regard to the payoff of the liens with regard to Possum Property until March 4. At that point in time the deeds to the Possum Property and the Potter Property had already been delivered. And so while an argument -- or testimony is given that the properties were treated the same, part of one deal, they were not treated the same in any way, shape or

form. Performance on one, and delivery of a deed before you can make an inquiry with regard to what may be due as far as the liens on the Possum Property.

As a result of these findings, the court instructed the jury that the Foster Property could not be bundled with the Possum Property and Potter Easement. In its final order, the court found that bundling "should not even be on the table for discussion" given the lack of timely written notice provided to Peggy.

We agree with the district court's general contention that the evidence does not support the idea that Simmons' purchase of the Foster Property was tied to or contingent on his purchase of the Possum Property and Potter Easement. However, we disagree with the court's characterization that Simmons' or Qualley's testimony provided an explicit indication of such bundling of the properties. Our reading of the testimonies indicates that neither Simmons nor Qualley ever testified that Simmons' purchase of the Foster Property was contingent upon his also purchasing the Possum Property and Potter Easement. Neither party explicitly testified that Simmons had to satisfy all of the liens on all three properties in order to be able to purchase any of the properties. Rather, the testimony establishes that Simmons satisfied the two liens on the Foster Property in exchange for gaining title to the Foster Property. Similarly, Simmons was to satisfy the liens on the Possum Property in order to gain title to it and the Potter Easement. Other evidence in the record supports the conclusion that there were two separate transactions, rather than one bundled transaction.

Simmons' answer to Peggy's interrogatory about the terms of the sale of the Possum Property and Potter Easement only referred to those two properties, and not the Foster Property. Simmons simply stated that he and Qualley agreed that Simmons would satisfy the preexisting liens on the Possum Property in return for ownership. Simmons' failure to specifically reference the Foster Property in his explanation of the price, terms, and conditions for the sale of the Possum Property and Potter Easement indicates that this sale was separate and distinct from the sale of the Foster Property.

Additionally, as the district court noted in its oral comments, the sale of the Foster Property was handled differently than the sale of the Possum Property and Potter Easement. Simmons wrote checks to pay off the liens on the Foster Property on February 28, 2019, almost immediately after the warranty deed granting him the Foster Property was filed. To the contrary, Simmons did not even inquire about the payoff amounts for the liens associated with the Possum Property until March 4, almost one week after the warranty deed conveying the Possum Property to him was signed and filed. Moreover, Simmons never paid off the liens on the Possum Property as he did on the Foster Property.

Upon our de novo review of all the evidence presented, we simply do not find sufficient evidence to demonstrate that Simmons' purchase of the Foster Property was tied to or contingent on his also purchasing the Possum Property and Potter Easement. The evidence indicates that Simmons and Qualley entered into two separate transactions: one for the sale of the Foster Property and one for the sale of the Possum Property and Potter Easement. Because there were two separate transactions, Peggy can only exercise her right of first refusal as to the transaction involving the Possum Property and the Potter Easement. She has no interest in the Foster Property and her exercise of the right of first refusal does not affect the sale of the Foster Property to Simmons.

*Claim to Quiet Title.*

Finally, Simmons argues that because the district court erred in granting Peggy specific performance, that the court also erred in failing to quiet title to the Possum Property and Potter Easement in him. Given our resolution of Simmons' previous arguments, we find this argument must also fail.

However, for the sake of completeness, we do note that the district court properly awarded Peggy specific performance by allowing her to exercise her right of first refusal and properly required Simmons, as the purchaser of the properties, to turn over title to Peggy. This court has previously held that a holder of an option to purchase real property, given for a valuable consideration and duly accepted, may, under the prevailing rule, maintain a suit for specific performance against one purchasing the property with notice of the option. *Hongsermeier v. Devall*, 16 Neb. App. 379, 744 N.W.2d 481 (2008). Simmons admitted that he had knowledge of Peggy's right of first refusal and he took no action to determine whether Qualley had satisfied the terms of Peggy's right prior to permitting Simmons to purchase the property. Given Simmons' knowledge, we do not find that it was inequitable to require him to deed the property to Peggy once she provided the appropriate consideration to Qualley. Accordingly, we do not find any error in the district court's failure to quiet title of the property in Simmons.

## CONCLUSION

We affirm the decision of the district court granting Peggy's request for specific performance and allowing her the opportunity to exercise her right of first refusal by purchasing the Possum Property and Potter Easement for the same price, terms, and conditions as that provided by Simmons.

AFFIRMED.